SUPERX DRUGS CORPORATION v. STATE
BOARD OF PHARMACY.

1. DRUGGISTS — LICENSES — CORPORATIONS — GRANDFATHER    CLAUSE
— STATUTES.
   Plaintiff corporation in mandamus proceeding *held*, entitled to
   proper license for operation of its pharmacy and drug store
   in city where record shows it and its predecessors had operated
   such an establishment from 1927, denial of renewal of license
   for noncompliance with pertinent statutes not having been
   well-founded.

2. COSTS—PHARMACY—LICENSES.
   No costs are allowed in mandamus proceeding to compel the
   State board of pharmacy to issue a license to plaintiff corpora-
   tion to operate a pharmacy.

BLACK, KAVANAGH, and SOURIS, JJ., dissenting.

Original mandamus by Superx Drugs Corpora-
tion, a Michigan corporation, against the State
Board of Pharmacy and David M. Moss, director
of drugs and drug stores, to compel issuance of
license to operate a pharmacy. Orders of reference
made to Calhoun circuit for taking of testimony and
for finding of facts. Submitted July 17, 1963.
(Calendar No. 32, Docket No. 50,087.) Writ granted
December 5, 1963, directing defendant board to
grant license. Rehearing denied February 3, 1964.

*Dickinson, Wright, McKean & Cudlip (Edgar C.
Howbert, William G. Warren* and *John E. S. Scott,*
of counsel), for plaintiff.

REFERENCES FOR POINTS IN HEADNOTES
[1]  17A Am Jur, Drugs and Druggists §§ 13–16.
[2]  14 Am Jur, Costs § 23.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Joseph B. Bilitzke* and *Maurice M. Moule,* Assistant Attorneys General, for defendants.

*Amicus Curiae:*

*MacLean, Seaman & Laing (Charles R. MacLean* and *Edward Draugelis,* of counsel), for Michigan State Pharmaceutical Association.

BLACK, J. (*dissenting*). Executive as well as legislative attempts to interfere with, trespass upon, or even coerce the judicial department are nothing new in the history of tripartite government. On account thereof the judiciary, sworn as it is to uphold and maintain the constitutionally requisite prerogatives of each department, has on historic occasion been compelled to meet head-on all such attempted invasions and, doubtless, will be so compelled as long as three-divisional government endures. This case, regrettably, confronts us with just such an occasion.

During President Jefferson's administration congress "actually closed down the supreme court for a year."[1] Later on President Jackson "commented," upon one of the court's decisions: "Well, John Marshall has made his decision; now let him enforce it."[2] And Jefferson continued unto death his effort to subordinate the court to the other constitutionally coequal departments. In that oft-quoted Jarvis letter[3] Jefferson wrote: "Our judges are as honest

[1] See Yale Law Professor Rodell's "Nine Men," Random House, 1955, p 85.
[2] Rodell, p 78.
[3] Quoted at length by Mr. Lincoln, in one of the Douglas debates (Springfield, Illinois, July 17, 1858). See 3 Life and Works of Abraham Lincoln, p 91 (Centenary Ed 1907, Current Literature Publishing Co.), (Also found in 3 Works of Abraham Lincoln, Lapsley [G. P. Putnam's Sons, 1905 Federal Edition], p 170, and in 7 Writings of Thomas Jefferson, ed. by H. A. Washington [Taylor & Maury, 1854], p 177.—REPORTER).

as other men, and not more so. They have, with others, the same passions for party, for power, and the privilege of their corps. Their maxim is *'Boni judicis est ampliare jurisdictionem'*, and their power [is] the more dangerous as they are in office for life, and not responsible, as the other functionaries are, to the elective control." And in another letter Jefferson characterized the opinions of the court this way:[4]

"An opinion is huddled up in conclave, perhaps by a majority of one, delivered as if unanimous, and with the silent acquiescence of lazy or timid associates, by a crafty chief judge, who sophisticates the law to his mind, by the turn of his own reasoning."

President Roosevelt's unprecedented court-packing bill of 1937, and the modern drumfire of attacks upon the supreme court in and out of congress,[5] have proved again and again that the judiciary must defend—sternly and promptly—its separational independence. That it has done so is both history and good for a country which reveres and prospers under a system of departmental separation, the case-hardened core of which is that each of the constitutional divisions must be kept completely independent of the others, so that the acts of each shall not be controlled by, or subjected to, directly or indirectly, the coercive influence of either of the others.

This Court, too, on 1 notable occasion where the essayed opening wedge was small but the principle great, did not hesitate (even in the absence of a pending action or proceeding) to advise the executive and legislative departments that it would countenance no trespass upon or interference with the

[4] Rodell, pp 93, 94.
[5] For a list of such modern attacks, see the *Park Case* (*Park* v. *Employment Security Commission,* 355 Mich 103) at 144.

judicial power, by such other departments. See "Letter from the Judges to the Governor," dated and signed in our courtroom April 12, 1881, by Michigan's nationally distinguished Justices COOLEY, CAMPBELL, MARSTON, and GRAVES (*Matter of Head Notes,* 43 Mich at 641).[6] And see *Dearborn Township* v. *Dearborn Township Clerk,* 334 Mich 673, 682, where, relying principally on Justice COOLEY's opinion of *People, ex rel. Sutherland,* v. *Governor,* 29 Mich 320 (18 Am Rep 89), the seated Court declared unanimously that "In many decisions this Court has upheld and jealously guarded the right to keep distinctly separate one department from another." Such guardianship is due from this Court —now.

We cannot blink the sordid fact that this has become a "political" case. It was made so last March by successive partisan intrusions, each gratuitous and wholly unwarranted, first by a Republican governor and then by a retorting Democratic State chairman, Mr. Ferency; all while the Court awaited due pleadings and orderly submission of the case. Now that a decision is due, we may no longer ignore such intrusions lest more of the same are encouraged by that silence which, in matters political, seems always to be taken as cowed submission or, worse, total indifference. Nor may any member of this Court pretend that he lives and works so far from the world of reality as to know nothing about the governor's hosanna-heralded entry into this yet pending case, and nothing about Chairman Ferency's immediate and equally indefensible counter-entry therein. It is true today, as formerly, that "Courts are not supposed to be blinded bats," and that "What

---

[6] This is the occasion when the Court advised the governor and the legislature that it is the duty of high Court judges, "though none object, to observe and respect the Constitution and rights of third parties acquired thereunder." 43 Mich at 642.

·all know, the courts must judicially know."[7] There is a point, indeed, where judicial purblindness ends and judicial notice begins.

This case is before us upon invocation of the Court's original jurisdiction. No circuit judge ever could have decided it. Nor could any such judge adjudicate any issue the parties so far have presented by their pleadings and briefs. And no one, the governor included, was ever possessed of right—either in fact or law—to conclude that Judge Coleman's special report to us, a report supposedly made for our exclusive consideration and appraisal, might or could be regarded as a judicial decision or judgment of any kind. Such reports are sought by this Court solely for aid and explanation in original ·cases, and the right and duty to accept or reject them is committed solely to our determination. Let that sink in.

So when the governor, somehow advised of the content of Judge Coleman's report prior to the very existence thereof being known to the Justices,[8] proceeded in public print to attack the defendant drug director upon alleged strength of that report, he opened and fully unleashed Pandora's box of politics upon this Court and upon a pending case with respect to which both he and Chairman Ferency should have kept still until, by judgment entered here, the judicial function is brought to due end. (At that time, of course, free speech and acid comment will become the right of everyone, governors and political chairmen included.)

And when the governor threatened in front page headlines to remove the defendant drug director, for grounds allegedly found in Judge Coleman's re-

---

[7] The quotations are taken from *Todd* v. *Hull*, 288 Mich 521, at 543.

[8] Most certainly including the writer as original and present assignee of the case.

port, he erred in another direction, this time in grievous fact. That report, as we find upon careful scrutiny thereof, provides no ground for judicial animadversion against the drug director distinguished from the defendant State board of pharmacy. Nor did Judge Coleman hint any such reproach against or censure of the director. The fact is that the director has no right to vote upon any matter which the statute commits to the board for administrative decision, and this record discloses conclusively that the director acted only in accordance with instructions of his own superintendent, that is, the defendant board. Hence, if judicially cognizable error was committed by anyone, against this plaintiff in the course of these administrative proceedings, the error was that of the board; not the director.

It is not amiss at this juncture to observe that the governor did himself no credit by openly taking 1 side of this case when his appointed legal adviser, Mr. Van Dusen, was upon judicially noticeable record a member of this plaintiff's law firm. See each annual issue of the Martindale-Hubbell Law Directory, starting with the year 1959 (1963 issue vol 2 at page 3005); also the official and current State Bar roster (42 MSBJ, No 6, p 185). And Chairman Ferency, himself a member of the bar and familiar with what is orderly and what is not with respect to a judicially pending case, should have maintained silence no matter what the governor did. The two are equally censurable.

These successive and unseemly performances have left the Court in what may be described—in minimal terms—as an embarrassing position. No matter the sincerity of repeated protestation that appellate court Justices are never coerced or influenced by the pulls and hauls of partisan politics, these highly stationed intruders have, by their acts, forced the

Court to decide between opponent litigants the respective causes of which have been publicly and controversially argued, *pendente,* by the 2 official spokesmen for the 2 great political parties. And the unhappy fact of all this is that the case is a public one, the ultimate result of which is bound to affect—for better or worse—the public health as well as the rights and interests of hundreds of citizens not represented today at our bar. That factor, aside from the strict and controlling limitations which determine grant or denial of our most extraordinary writ,[9] is the salient reason for conviction of the undersigned that all of the legal and factual issues (quoted post) plaintiff would have determined should come first to complete and orderly submission before and determination of the defendant board.

Now, save only by this second-in-our-history "Letter" to the governor, there is no way to avoid the *appearance,* that odious if false *appearance,* that some voting here to give this plaintiff—peremptorily—everything it demands, and some voting here to remand for complete administrative submission and determination as a condition of rightful judicial review, have been influenced either way by applied partisan pressures. And surely, without such "Letter," the cynics of partisan politics are due to proclaim again, as when the latest apportionment case was handed down (*Scholle* v. *Secretary of State,* 367 Mich 176), that sly old saw anent partisan-nominated judges: "Once we judged judges by the company kept by them, but now we judge judges by the political parties that keep them." Hopefully

---

[9] This original petition for mandamus was filed in 1962, shortly before the effective date of the new Court Rules. Commencing January 1st last the writ of mandamus was superseded by the "order of superintending control." GCR 1963, 711.3. Starting in 1964, it will be known constitutionally as a "prerogative" writ. Const 1963, art 6, § 4.

then, this foreword will serve to eliminate repetition of that which has made it necessary. It will in any event serve to introduce properly an exclusively decisive question: whether this plaintiff in mandamus had and yet has an available and adequate legal remedy.

Reflective thought upon this voluminous record proves that the attorney general was right when he insisted, in brief supporting the defendant board's answer (filed October 5, 1962), that plaintiff was attempting by the instant petition for mandamus to bypass Michigan's administrative procedure act of 1952 (CLS 1956, § 24.101 *et seq.* [Stat Ann 1961 Rev § 3.560(21.1) *et seq.*]). The same reflective thought proves that plaintiff in turn was right when, in brief filed October 30, 1962, it rather heatedly opposed the attorney general's motion for an order of statutory reference. This in summary shrift means that our successive orders of reference and remand, each having issued under CL 1948, § 636.4 (Stat Ann § 27.2231),[10] have turned out to be quite improvident and that the instant petition should then have been dismissed with the same instructions as will presently appear. This plaintiff really did have, and yet may have by order of remand, an adequate legal remedy for all of its currently urged grievances.

By its petition and supporting brief plaintiff requests our peremptory writ "commanding defendants to issue forthwith a renewal license for plaintiff's Battle Creek store." That was the basic issue which arose before the defendant board when plaintiff vainly applied to the board for a renewal license under PA 1885, No 134, as amended (CL 1948 and

---

[10] The first of these orders was entered October 30, 1962. It directed that the Calhoun circuit court take required proofs as on framed issues of fact. The second of such orders was issued January 28, 1963. That order remanded the taken record of testimony to the Calhoun circuit for determination of such framed issues of fact and due report thereof to this Court.

CLS 1956, § 338.401 *et seq*. [Stat Ann 1956 Rev' and
Stat Ann 1961 Cum Supp § 14.721 *et seq.*]).[11] .The
board proceeded not only to summary denial; it
provided plaintiff no fair or due process and as-
sumed to render its decision solely on *ex parte* proof
tainted much by pure hearsay and the recorded
hoorahs of a not too well controlled public gather-
ing; referring to the presently described assembly
of plaintiff's pharmaceutical competitors. This was
an offense to State and national guaranties of due
process as well as to sections 4, 5, and 6 of the
mentioned act of 1952 (CLS 1956 §§ 24.104–24.106
[Stat Ann 1961 Rev §§ 3.560(21.4)–3.560(21.6)]),
and it amounted to an outright denial of the right
of confrontation which, in the field of administrative
law as well as in criminal jurisprudence, is due right-
fully for judicial guardianship.[12]

No one of the questions plaintiff states and
presents before us (all appear in the margin[13]) were
raised of record before the board. With respect to
plaintiff's said application the board proceeded to
hold what is termed in the record "the hearing of

---

[11] This act has now been repealed and is superseded by PA 1962,
No 151 (CL 1948, § 338.1101 *et seq*. [Stat Ann 1963 Cum Supp
§ 14.757(1) *et seq*.]).—REPORTER.

[12] See Davis, Administrative Law and Government (West Pub-
lishing Co. 1960), ch 7, p 143, under heading "The need for con-
frontation":

"When facts about an individual are in dispute, our legal tradition
is that the party affected is entitled not only to rebut or explain the
evidence against him but also to 'confront his accusers' and to cross-
examine them."

See, also, annotation 18 ALR2d 552, headed "Administrative de-
cision or finding based on evidence secured outside of hearing, and
without presence of interested party or counsel."

[13] "1. Did the pharmacy board have a discretionary right to deny
plaintiff's application for renewal of its drug store license?

"2. Did the board of pharmacy abuse its discretion in denying
plaintiff's application for renewal of its drug store license?

"3. Is plaintiff entitled to exercise the rights of a 'grandfather'
provided for in PA 1927, No 359 (CL 1948, § 338.481 [Stat Ann 1956
Rev § 14.771])?

"4. Is plaintiff estopped to question the constitutionality of PA
1927, No 359?

"5. Is PA 1927, No 359 unconstitutional?"

September 26, 1962." The "hearing," such as it was, commenced in the State (Stevens T. Mason) office building and then was "adjourned" to 1 of the auditoriums in the Lansing civic center. There it proceeded before some 900 pharmacists, gathered presumably for the purpose of voicing objections to plaintiff's application. The board heard all speeches and remarks, some catcalls included, and then returned to its own quarters. There it resolved upon the decision of denial, recorded as in "minutes" as follows:

"Meeting reconvened in Room 115, Stevens T. Mason building, Lansing, Michigan, at 11:30 a.m.

"Mr. Moss informed the board members that he had received additional information concerning the Herman Pharmacy, 68 West Michigan avenue, Battle Creek, Michigan. This was in the form of an inspection sheet showing that Mr. Herman filled and refilled barbiturate and amphetamine prescriptions without the physician's signature. The report was signed by Mr. Herman and the inspection was made by State Inspector Kenneth French.

"Furthermore, a telephone call had been received from Mr. Mark Louis Briggs, former owner of the Owl Drug, Inc., which is now the Herman Pharmacy. He advised Mr. Moss that the store had been closed due to the fact he could not make his payments, in January of 1958. The mortgage company took over, reopened with him (Mr. Briggs) as manager, until July of 1958, at which time it was again closed and remained closed until the latter part of November 1958.

"Mr. Moss felt that the evidence supplied by our inspector would substantiate the affidavit read by Mr. Charles MacLean, to the effect that Mr. Herman was dispensing without proper prescription. After further discussion Mr. Gillespie made the following motion:

" 'I now move the Michigan board of pharmacy, under provision of PA 1885, No 134, § 19 (CL 1948,

§ 338.419 [Stat Ann 1956 Rev § 14.741]),[14] which states:

"'"The State board of pharmacy shall have the power to withhold a license from any applicant whenever it shall be satisfied that the safety of the public health will be endangered by reason of the habits or character of such applicant."

deny the application for a pharmacy and narcotic license of the Superx Drugs Corporation, 68 West Michigan avenue, Battle Creek, Michigan, on the ground the management has not fulfilled the requirements of the pharmacy laws of the State of Michigan, due to dispensing barbiturate and amphetamines without prescription signed by the physician, dentist or veterinarian, which is in violation of the dangerous drug act, PA 1943, No 204, as amended by PA 1961, No 28 (CL 1948, § 335.101 *et seq.*, as amended [Stat Ann 1957 Rev and Stat Ann 1961 Cum Supp § 18.1101 *et seq.*]):

"'"(c) Druggists and pharmacists shall be prohibited from selling, giving away, bartering or otherwise disposing of barbituric acid and any of its derivatives, chloral hydrate, paraldehyde, or amphetamines and methamphetamine and their salts and derivatives, except on prescription of a licensed physician, dentist or veterinarian." '[15]

"Motion seconded by Mr. Paul Coussen, and unanimously carried by vocal roll call of the members of the Michigan board of pharmacy."

Refer now to section 8 of the act of 1952.[16] No effort was made by plaintiff to seek review of the board's determination as in that pointedly available section provided. Its counsel must have known, as Governor Williams observed when he returned to the senate, duly signed, the act of which section 8 is

---

[14] See, currently, PA 1962, No 151, § 15 (CL 1948, § 338.1115 [Stat Ann 1963 Cum Supp § 14.757(15)]).—Reporter.

[15] This prohibition appears in section 1 of the act.—Reporter.

[16] CLS 1956, § 24.108 (Stat Ann 1961 Rev § 3.560[21.8]).—Reporter.

a part, that "The apparent objective of the bill is to prevent arbitrary action or action without adequate public hearing on the part of any State administrative agency." (Senate Journal 1952, p 1338.) Too, such counsel must have known that a direct and ample right of review, in the circuit court, was by section 8 open as a remedy for the defendant board's inexplicable whimsey of decision on the kind of proof its minutes disclose. Nevertheless, and as rather inelegantly put by the attorney general in his said brief (October 5, 1962), "the petitioners ran to this Court without even attempting to chance the appellate procedures set out by the legislature." Such run was a mistake—the same mistake a like petitioner for mandamus made in *Goldsmith* v. *United States Board of Tax Appeals,* 270 US 117, 123, 124 (46 S Ct 215, 70 L ed 494).

Had plaintiff sought review under said section 8, the circuit court then would have been confronted with the same record of arbitrary administrative action plaintiff, by its attempted bypass of section 8, has brought directly here. That court would, we must assume, promptly have reversed and remanded for due hearing and with firm suggestion that the board examine and then conform to the processual religion of the act of 1952. And what that court would have done, we should do now, the better and the quicker to get the case back on its rightful procedural track.

In the ultimate this record portrays a total failure of administrative due process; a record which wants an orderly presentation of proof before the statutory administrator and a determination, by such administrator upon that proof, of plaintiff's said application. For such failure the defendant board became and remains primarily responsible even though plaintiff, headlong-bent as it was for the goal of our clerk's office, compounded the board's error

by end-running the circuit court so far as to take its rights well over the legal sideline. Decisional touch-downs are not scored that way. See the *Goldsmith Case, supra.*

The painful result is that plaintiff has not shown a clear legal duty on the part of the board to license it as prayed. It has shown only a reversible and remandable failure of due process, and we need but repeat what was said—of the extraordinary writ plaintiff seeks—in *Toan* v. *McGinn,* 271 Mich 28, 34:

"The applicable rules are clear. To support mandamus, plaintiffs must have a clear legal right to performance of the specific duty sought to be compelled; defendants must have the clear legal duty to perform such act; and it must be a ministerial act, one 'where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.' 38 CJ, Mandamus, § 72, p 598. See, also, *Globe Indemnity Co.* v. *Richer,* 264 Mich 224; *Sezor* v. *Proctor & Gamble Soap Co.,* 267 Mich 128."

The rule of this case has been followed many times, in a variety of instances attested by the signatures of veteran Justices Carr and Dethmers, notably *Kosiba* v. *Wayne County Board of Auditors,* 320 Mich 322, at 326 (Dethmers and Carr); *Janigian* v. *City of Dearborn,* 336 Mich 261, at 264 (Dethmers and Carr); *State Highway Commissioner* v. *Ottawa Circuit Judge,* 339 Mich 390, at 395 (Carr); *Taylor* v. *Ottawa Circuit Judge,* 343 Mich 440, at 444 (Dethmers and Carr); *Cochrane* v. *Mesick Consolidated School Board of Education,* 360 Mich 390, at 416 (Dethmers). Today, however, it is ignored.

To date, no record has been made before the defendant board on the basis of which this Court or any court would have been, or now might be, justified in ruling that the board has "a clear legal duty" to grant plaintiff the consequentially far-reaching li-

cense it seeks. True, plaintiff may have been able and may yet be able to make such record. Failing so far in such regard, it did not even demand or invoke before the board its undoubted right to make such record. And, vitally, it did not seek to review, as it could and should have done under said section 8, the board's summary denial of its filed application. That is enough to establish that plaintiff's instant petition is both premature and dismissible for want of that showing *Toan's* standard rule imperatively requires.

But it is said that plaintiff's remedy at law (under the act of 1952) is inadequate, in that (quoting the Chief Justice):

"Such court [circuit on review under said section 8] is not given specific authority to enter the order that it may conclude the agency should have issued. Assuming that defendant board on resubmission to it of plaintiff's application for a license enters an order of denial, and the circuit judge on appeal concludes that plaintiff was under the proofs entitled to such license, a mandatory order for its issuance would clearly be beyond the jurisdiction of the circuit court."

This belatedly conjured picture of a woebegone circuit judge, seated helpless to enforce the reversing order he has entered under said section 8, will bring sympathetic tears to the eyes of all who, viewing it in print, are not too familiar with circuit court jurisdiction. The tears, though, may be quickly dried.

Let us read, first, section 8, subd (6), of the act of 1952 (CLS 1956, § 24.108 [Stat Ann 1961 Rev § 3.560(21.8)]):

"(6) The [circuit] court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision

if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted, or contrary to the overwhelming weight of the evidence; or

(f) Arbitrary or capricious."

Let us read next what has been repealed (by PA 1961, No 236, § 9901; [CLS 1961, § 600.9901, Stat Ann 1962 Rev § 27A.9901]), and so is mistakenly depended upon by the Chief Justice to support his quoted declaration of circuit court debility (CLS 1948, § 636.3 [Stat Ann § 27.2230]):

"No circuit court shall have jurisdiction to issue a writ of mandamus against any State officer."

View now what by statute has replaced said section 636.3:

"All actions for mandamus against State officers shall be commenced in the Supreme Court." PA 1961, No 236, § 4401 (CLS 1961, § 600.4401, Stat Ann 1962 Rev § 27A.4401)."

If the former restriction (by section 636.3) ever meant anything in the context of enforcement of a section 8, subd (6), order of reversal (the undersigned are agreed that it never has), such restriction means nothing now in view of its repeal. The fact is that, ever since the administrative procedure act became effective in 1952, the circuit court, on review provided by section 8, subd (6), of that act, has been clothed with express as well as inherent power to enforce any order of reversal it might enter under

said section 8, subd (6). Consider section 10 of article 7 (Const 1908), conferring upon the circuit courts power "to issue such other writs as may be necessary to carry into effect their orders, judgments and decrees," and the legislative echo thereof found in the judicature act of 1915. The statute provided (CL 1948, § 606.1, subd 6 [Stat Ann § 27.542]) original and exclusive circuit court jurisdiction "to make all orders in any cause pending therein, which may be necessary or proper for carrying into effect the jurisdiction vested in such courts by law, and to give full effect to any judgment of such courts and may enforce any lawful order so made by attachment and proceedings for contempt." The provision reads now (PA 1961, No 236, § 611 [CLS 1961, § 600.611, Stat Ann 1962 Rev § 27A.611]):

"Circuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts' jurisdiction and judgments."[17]

In the highly improbable instance of administrative insubordination the Chief Justice fears, there would be no need or occasion for issuance by any court of a writ of mandamus or order of superintending control. Should any agency, the decisions of which are subject to judicial review under section 8, subd (6), refuse to act in accordance with a circuit court order or judgment of reversal, the court's power to enforce by contempt would be just as effective as would this Court's corresponding power to enforce its own orders. The Chief Justice,

[17] Of course, in final analysis, the circuit court having been empowered to reverse as in section 8, subd (6), provided, the inherent power to effectuate its judgment of reversal has always been existent regardless of enabling statute or court rule. As said in *Muskrat* v. *United States*, 219 US 346, 356 (31 S Ct 250, 55 L ed 246), "Judicial power is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." This rule was expressly followed and applied, as to circuit court jurisdiction, in *Goetz* v. *Black*, 256 Mich 564, 569, 570 (84 ALR 802).

seemingly, has failed to perceive the distinction between an "action for mandamus" to compel dutiful action and proceedings in any pending cause or matter to effectuate an order or judgment the seated court has previously entered with sanction of law. Our circuit courts having been empowered under section 8, subd (6), to reverse, such courts have power "to fully effectuate" their section 8, subd (6), judgments of reversal. The undersigned is not in fact aware that this plaintiff contends otherwise.

One need but add, should a majority of the membership of this Court sign what the Chief Justice has written, that Michigan's administrative procedure act will have been fully emasculated so far as concerns judicial review in circuit as now provided in said section 8. In such event any aggrieved applicant for license may bypass the circuit court by heading direct to this Court with an application for order of superintending control, in which he or it need but allege inadequacy of the statutory remedy of review. On what ground? Why simply that the circuit courts lack "jurisdiction" to effectuate such remedy. Quite a prospect, this. The aggrieved party would have a free selection, according to selective *ex parte* advantage, between review under section 8, subd (6), or review in the Supreme Court by application for extraordinary writ.

It is said next, by the Chief Justice, that the plaintiff's remedy of judicial review—under the act of 1952—is not exclusive, and a portion of the first paragraph of section 8 of the act is quoted as follows:

"Nothing in this section shall be deemed to prevent resort to other means of review, redress, relief or trial *de novo,* provided by law."

True enough, such remedy is not exclusive if another remedy is "provided by law." But there is

no such "other" remedy, the present pleadings and record considered. The question again is whether plaintiff's remedy of review, under section 8, is fully adequate. If it is, no peremptory writ or order should issue as a matter of "policy" (GCR 1963, 711.2), to say nothing of *Toan's* rule, previously quoted. This brings us to the final reason the Chief Justice gives for inadequacy. It is:

"In its petition for writ of mandamus plaintiff alleged that defendant Moss sought to close the Battle Creek store of petitioner for the purpose of interrupting the continuous operation thereof, thus creating a bar to plaintiff's claim that it was entitled to the rights granted by the 'grandfather' clause of the statute above quoted. However that may be, it is obvious that following the procedure suggested of remanding to the pharmacy board, and leaving plaintiff to a remedy other than by resort to a mandamus proceeding in this Court, might well result in such closing and thus break the continuity of operation on which plaintiff relies."

There is a short answer to this, assuming plaintiff's rights do require the utmost of judicial protection against all suppositions of prejudicial nature. Upon remand with presently indicated instructions, let us simply do as was done before when the same alarum was previously sounded, that is, enter a special order authorizing plaintiff, pending final determination of its application for license, to "continue its operation of the drug store or pharmacy in said city of Battle Creek without interference thereof on the part of the defendant board."[18] The undersigned will support such an order, and such an order should soothe all concern for plaintiff's allegedly imperiled rights.

[18] The quotation is from the concluding paragraph of our order to show cause, entered October 16, 1962.

Yes, there is a way to handle such matters, a right way rather than that wrong way which always results in bad law, and so much for this makeshifty notion that plaintiff has no adequate remedy. Plaintiff has had and now has such a remedy, and has deliberately chosen not to pursue it. That is enough to call for denial of what all courts for historic reason regard jealously as their most exceptional and sparingly issued writ; the writ professional Michigan knows now by a different name.

We might well stop here, and announce that a judgment of dismissal of plaintiff's petition should be entered, without prejudice to a genuine hearing before and determination by the defendant board. But the error below, the importance to many interested yet unrepresented parties of all relevant issues which must originate before the board, and the possible effect due resolution thereof may have upon the public health, suggest that plaintiff's petition for mandamus and our order to show cause should be treated as a granted petition for review, by the constitutional writ of certiorari, of the board's decision of September 26, 1962. Thus may this Court spell out now, rather than later, the duties of a State agency when a "contested case"—defined in section 1 of the administrative procedure act of 1952—is presented before it.

Here, visibly and vigorously, the defendant board did have before it, on September 26, 1962, a "contested case." The plaintiff was determined that it should have a license immediately per application, and several hundred independent druggists were equally determined that no such license should issue.[19] But the process that was due, expressly by the

[19] The obvious reason for such controversy, which I am fain to record, is that the druggists foresaw from plaintiff's application State-wide chain store pharmacy by a formidable competitor, the Kroger Company, owner of all of the capital stock of plaintiff Superx Drugs Corporation.

act of 1952, was denied in the heat of what actually became a political controversy. For that error the defendant board's determination of September 26, 1962, should be vacated with instructions found below.

When courts sit for review of administrative decisions by which statutory licenses are granted, denied, revoked, or suspended, they do not thereby enter the administrative business of licensure. As said in *Federal Power Commission* v. *Idaho Power Co.*, 344 US 17, 20 (73 S Ct 85, 97 L ed 15):

"When the court [court of appeals for the District of Columbia circuit] decided that the license should issue without the conditions, it usurped an administrative function. There doubtless may be situations where the provision excised from the administrative order is separable from the remaining parts or so minor as to make remand inappropriate. But the guiding principle, violated here, is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the commission for reconsideration (citing cases)."

So in many of the States, as in our State, all former questions having to do with the respective functions of courts and administrators are resolved now by what have become known as uniform administrative procedure acts, of which our said act (of 1952) is a general counterpart. An up-to-date resume of such acts so far in effect appears in 2 Am Jur 2d, Administrative Law, § 201 *et seq.*, starting on page 32, under heading of "Administrative Procedure Acts," and it is altogether probable that Michigan's adoption of the uniform act was stimulated by Mr. Hoyt's treatise, "Should Michigan Adopt an Administrative Procedure Code," 29 MSBJ, No 2, p 33, by which this trenchancy came before the bar in 1950 (p 37):

·"Another thing that the courts have from time to time insisted upon, but the administrative agencies are sometimes prone to forget, is that the decision of the agency must be based solely on the record whose contents all parties have had an opportunity to know, and not on confidential or outside information received by the agency from its own investigators or others. As the supreme court of the United States has put it, manifestly there is no hearing when the party does not know what evidence is offered or considered, and is not given an opportunity to test, explain or refute."

The quotation discloses that the defendant board erred, fundamentally and reversibly, when its quoted decision of denial was made for reasons declared therein. Accordingly, and on instructional remand, the board should proceed with dispatch, under the act of 1952, (a) to hear and consider all admissible proof tendered in support as well as against plaintiff's application; (b) to hear and consider all admissible proof interested parties may offer for and against what was and still remains the real issue of importance[20]; (c) to consider no *ex parte* or nonconfronted proof (as the "minutes" aforesaid show was unabashedly done); and (d) to determine all questions which interested parties may then present before it.

As to the aforesaid real issue of importance I would hint no opinion. The defendant board is charged with administration of our statutes pertaining to pharmacy, and the questions to be heard and decided on remand are those of specific application of statutory terms, to presented facts, which the appointed agency of administration must determine

[20] Whether upon the facts dealing with the history of and acquisition by plaintiff of Owl Drug and/or Herman Pharmacy plaintiff succeeded to the status of a "grandfather" under section 1 of the pharmacy ownership act of 1927 (CL 1948, § 338.481 [Stat Ann 1956 Rev § 14.771]).

initially (*Unemployment Compensation Commission v. Aragon,* 329 US 143, 153 [67 S Ct 245, 91 L ed 136]; following *National Labor Relations Board* v. *Hearst Publications, Inc.,* 322 US 111, 131 [64 S Ct 851, 88 L ed 1170]). As said in *Aragon,* at 155, courts usurp the administrative function when they assume to set aside an administrative determination upon some ground not theretofore presented before and decided by the statutory administrator or administrators.

*To conclude:* The final outcome of this case will mean grant or denial of a million dollar chain store pharmacy license. That outcome should be attained by orderly due process of administrative law; not by the convenience of ratification by this Court of its undenied interlocutory error; the error which Justice SMITH describes as that of having "accepted and maintained jurisdiction in this case" and which I describe as the error of having omitted summary denial, with included instructions, of this original petition for mandamus.

Until now, orders to show cause and of reference in mandamus proceedings—all of which are supposedly provisional—have not been regarded as finally binding or adjudicatory of anything. Most certainly they do not determine that mandamus is the petitioner's proper remedy (*Reed* v. *St. Clair Circuit Judge,* 122 Mich 153; *Olson* v. *Muskegon Circuit Judge,* 49 Mich 85). Today, however, we learn that decisions to grant or deny such orders had best receive full scale study rather than that which, hitherto, has been time-budgeted for all like decisions *pendente.* The lesson of Superx learned, some of us will have to proceed with greater vigilance as future original petitions arrive lest we commit ourselves to having "accepted and maintained jurisdiction."

Accepting plaintiff's petition as having sued out certiorari to the defendant board, I conclude that the

.defendant board's determination of September 26, 1962, should be vacated, and that the record should be remanded to such board for further proceedings consistent with this opinion. I would enter an order accordingly, awarding no costs, and at the same .time would enter a separate order continuing in effect the quoted portion of our said order of October 16, 1962, until final determination is made, either by the defendant board or by a court of review, of all issues that are properly presented to and decided by the board upon remand.

CARR, C. J. The issues in this case should be decided by this Court on the record presented and the briefs and arguments of the respective parties. The primary question involves the right of the plaintiff to receive from the defendant board a license to operate its pharmacy in the city of Battle Creek. The facts are fully presented in the record that has been made. In view of that record and the proceedings taken before the defendant State board of pharmacy on plaintiff's application for the issuance of a license for the year beginning July 1, 1962, a decision of the controversy should not be here refused and the proceeding remanded to the defendant board for possible action there. This Court should retain its jurisdiction.

Involved in a determination of the matters at issue are certain provisions of the statutes relating to the practice of pharmacy in this State. The powers and duties of defendant board are prescribed by P.A. 1885, No 134[1], as amended. Section 5 of said act, CL 1948, § 338.405, as last amended by P.A. 1958, No 193

[1] CL 1948, § 338.401 et seq., as amended (Stat Ann 1956 Rev and Stat Ann 1961 Cum Supp § 14.721 et seq.).

This act has now been repealed and is superseded by P.A. 1962, No 151 (CL 1948, § 338.1101 et seq. [Stat Ann 1963 Cum Supp § 14.757 (1) et seq.]).—REPORTER.

(Stat Ann 1961 Cum Supp § 14.725), reads as follows:

"It shall be unlawful for any person, firm or corporation to engage in the business of selling at retail, drugs and poisons or compounding prescriptions, except those who are exempted from registration under section 18 of this act, without first securing from the State board of pharmacy a license as hereinafter provided for each separate place in which said business is to be carried on. Application for such license shall be in writing and shall be accompanied by a payment to said board of the sum of $15 as a license fee. Such licenses shall be valid for a period of 1 year commencing on July 1st and ending on the 30th day of the next June, and such license shall contain the name of the licensee and the address of the place at which such business will be conducted. Every person, firm or corporation, and every member or officer thereof, who violates the provisions of this section shall be guilty of a misdemeanor, and upon conviction thereof shall be liable to the penalties provided in section 32 of this act."

The statute further requires that no one other than a registered pharmacist may engage in the dispensing, compounding, or sale of drugs, medicines, or poisons, anywhere within the State, except as otherwise expressly provided.

Also involved is the application, under the facts in the case, of PA 1927, No 359 (CL 1948, § 338.481 *et seq.* [Stat Ann 1956 Rev § 14.771 *et seq.*]), the first section of which act reads:

"Every pharmacy, drug store or apothecary shop shall be owned by a registered pharmacist and no partnership or corporation shall own a drug store, pharmacy or apothecary shop unless at least 25% of all stock is held by registered pharmacists, except that any corporation, organized and existing under the laws of the State of Michigan, or any other State

of the United States, authorized to do business in the State of Michigan and empowered by its charter to own and conduct pharmacies, drug stores or apothecary shops and which, at the time of the passage of this act, owns and conducts a drug store or stores, pharmacy or pharmacies, apothecary shop or shops in the State of Michigan may continue to own and conduct the same and may establish and own additional pharmacies, drug stores or apothecary shops in accordance with provisions of this article: Provided, That any such corporation which shall not continue to own at least 1 of the pharmacies, drug stores or apothecary shops theretofore owned by it, or ceases to be actively engaged in the practice of pharmacy in the State of Michigan, shall not be permitted thereafter to own a drug store, pharmacy or apothecary shop: And provided further, That any person not a registered pharmacist who at the time of the passage of this act owns a pharmacy, drug store or apothecary shop in the State of Michigan, may continue to own and conduct the same in accordance with existing laws and regulations: And provided further, That the administrator, executor or trustee of the estate of any deceased owner of a pharmacy, drug store or apothecary shop, or the widow, heirs or next of kin of such deceased owner, may continue to own and conduct such pharmacy, drug store or apothecary shop in accordance with existing laws and regulations: Provided further, That this act shall not apply to stores or shops in which patent or proprietary medicines and ordinary domestic or household remedies, such as the sale of is provided for in section 18 of Act No 134, Public Acts of 1885,[2] are the only drugs and medicines sold at retail."

Plaintiff was incorporated under the laws of Michigan in December, 1909, as "Baker-Jones Company." In 1913 the name was changed to "Owl Drug

---

[2] Reference is to CL 1948, § 338.418 [Stat Ann 1956 Rev § 14.740]) now repealed. See *ante*, p. 44.—Reporter.

Company", and in September, 1962, to "Superx Drugs Corporation." Following its organization it operated a retail drug store and pharmacy in the city of Battle Creek, Michigan. It is its claim in the instant proceeding that it has continuously operated said store to the present time, and, specifically, that at the time of the enactment of PA 1927, No 359, and continuously since that time, it conducted such operation. In its petition filed in this Court by which it sought relief by way of writ of mandamus requiring defendant board to grant its application for a license, it asserted that it was entitled to the rights recognized by the so-called "grandfather" clause of said act. The petition further alleged that its license to operate was renewed annually from the date of its incorporation through and including July 1, 1961, that on or about June 5, 1962, it made application for a renewal of such license for the year beginning July 1st thereafter, and that on July 10th it filed applications for new stores that it proposed to open in Plymouth and Ypsilanti.

Plaintiff further alleged that it was given certain explanations or excuses for delay in issuing the licenses, and that on September 24, 1962, it was advised by telegram that a meeting would be held on September 26th in the city of Lansing. It was claimed that said notice did not comply with the administrative rule adopted by defendant board to the effect that notices of hearings before the board of pharmacy should be given by registered mail at least 15 days prior to a hearing. The meeting was held on the 26th of September at the Lansing Civic Center, and was attended by 900 or more individuals apparently seeking to prevent, if possible, the granting of the license to plaintiff. Discussion of the manner in which the hearing was conducted would serve no useful purpose here. Following the hearing, and at approximately 2 o'clock in the afternoon of Sep-

tember 26th, plaintiff's representatives at the meeting were informed by defendant Moss that the application for a license had been denied because of violations of the statute relating to the sale of drugs. The petition filed in this Court alleged also that defendant Moss informed plaintiff's representatives that he was directing the Michigan State police to carry out defendant board's order. In this connection it may be noted that on the 27th of September officers of the Michigan State police appeared at plaintiff's store but apparently did not undertake to close it. The petition for writ of mandamus was filed in this Court on that day.

The written order issued by defendant board on plaintiff's application was dated September 27, 1962, and the material part thereof read as follows:

"The Michigan Board of Pharmacy, under provision of PA 1885, No 134, § 19, as amended (CL 1948, § 338.419 [Stat Ann 1956 Rev § 14.741])[3] which states:

" 'The State board of pharmacy shall have the power to withhold a license from any applicant whenever it shall be satisfied that the safety of the public health will be endangered by reason of the habits or character of such applicant,'

deny the application for a pharmacy and narcotic license of the Superx Drugs Corporation, 68 West Michigan avenue, Battle Creek, Michigan, on the ground that management has not fulfilled the requirements of the pharmacy laws of the State of Michigan, due to dispensing barbiturate and amphetamines without prescription signed by the physician, dentist or veterinarian, which is in violation of the dangerous drug act, PA 1943, No 204, as amended by PA 1961, No 28 (CL 1948, § 335.101 *et seq.,* as amended [Stat Ann 1957 Rev and Stat Ann 1961 Cum Supp § 18.1101 *et seq.*]):

---

[3] See, currently, PA 1962, No 151, § 15 (CL 1948, § 338.1115 [Stat Ann 1963 Cum Supp § 14.757(15)]).—Reporter.

" '(c) Druggists and pharmacists shall be prohibited from selling, giving away, bartering or otherwise disposing of barbituric acid and any of its derivatives, chloral hydrate, paraldehyde, or amphetamine and methamphetamine and their salts and derivatives, except on prescription of a licensed physician, dentist or veterinarian."[4]

"Yours very truly,
"DAVID M. Moss, Director,
"DMM:dt                    "Drugs and Drug Stores."

With reference to said written order it may be noted that PA 1952, No 197, § 7[5], relating to procedure before State administrative agencies, reads as follows:

"Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Parties to the proceedings shall be notified forthwith of the decision and order in person or by mail. A copy of the decisions and order and accompanying findings and conclusions shall be delivered or mailed upon request to each party and to his attorney of record."

It thus appears that the order of the board based a denial of the license sought by plaintiff on the theory that acts of employees of plaintiff had endangered the safety of the public health "by reason of the habits or character" of Superx. Obviously the order may not be construed as embodying any other reason for the action taken.

As before stated, plaintiff's petition for relief from the order of defendant board was filed in this Court on September 27, 1962. On behalf of defend-

4 This prohibition appears in section 1 of the act.—REPORTER.
5 CLS 1956, § 24.107 (Stat Ann 1961 Rev § 3.560[21.7]).

ants answer thereto was filed, in substance denying plaintiff's right to the relief sought. Said answer asserted that plaintiff's Battle Creek drug store was not operated for approximately 3 months during 1958, thereby impliedly denying plaintiff's claim that it was entitled to the benefit of the so-called "grand-father" clause of the statute above quoted. It was also asserted that the hearing on September 26, 1962, was not called pursuant to the provisions of Rule 31 of the State board of pharmacy[6] nor to the provisions of PA 1952, No 197[7], but, rather, was a "public hearing." No explanation is given as to the reasons for calling it such. In other respects the answer neither admitted nor denied plaintiff's averments in its petition but left plaintiff to its proofs.

An order was issued by this Court under date of October 16, 1962, requiring defendants to show cause why the relief sought by plaintiff should not be granted with reference to the renewal of the license of the drug store or pharmacy located in Battle Creek. It was further ordered that pending the determination of the case, or the further order of the Court in the premises, petitioner might continue its operation of said store without interference on the part of defendant board. Shortly thereafter motion for order of reference for the taking of testimony on the issues of fact presented by the pleadings was filed on behalf of defendants. The motion was granted on October 30th following, and the case was remanded to the circuit court of Calhoun county for the taking of proofs before 1 of the judges of said court and the filing of a transcript of the testimony so taken. Such hearing was assigned to the Honorable Creighton R. Coleman, circuit judge, who proceeded to carry out the order of reference. A pre-

[6] See 1954 AC, § R 338.461, p 3208.—Reporter.
[7] CLS 1956, § 24.101 et seq. (Stat Ann 1961 Rev § 3.560[21.1] et seq.).—Reporter.

trial hearing was held at which the parties through their counsel agreed that the issues for determination were as follows:

"1. Did plaintiff operate a drug store in September, 1927, and has it continued to operate one from that date through October 1, 1962?

"2. Did plaintiff cease to be actively engaged in the practice of pharmacy in the fall of 1956 [1958 sic]?

"3. Have the defendants been guilty of an abuse of discretion in treating plaintiff's application for renewal license at its Battle Creek store?

"4. What was the reason for the denial of plaintiff's license application, which took place on September 26, 1962?

"5. Does an act requiring that registered pharmacists hold 25% of the stock of a corporation owning a drug store bear a reasonable relation to the health, safety, and morals of the people of the State of Michigan?

"6. What has been the common practice of pharmacists with respect to dispensing barbiturates and amphetamines on oral prescription?

"7. What evidence of alleged violations of the hypnotic drug act and the pharmacy act was before the pharmacy board when it denied plaintiff's renewal license?"

Counsel for the parties also entered into a stipulation of facts covering the formation and operation of the plaintiff, its name changes, its continuous operation of the drug store in Battle Creek from January 1, 1927, to January 1, 1958, and its compliance with laws of the State relating to returns and reports to State agencies. It was also stipulated that for certain years licenses were issued by defendant board covering the operation of said store under the names of officers thereof. It clearly appears from the record that prior to July 1, 1962, the store

was operated under licenses, duly issued, authorizing such action. . .

Following the taking of the testimony before Judge Coleman and its filing in this Court an order was entered under date of January 28, 1963, directing remand of the transcript to the circuit judge for preparation and submission to this Court of an opinion making due determination of the issues of fact involved. It was also directed that following the filing of the desired opinion the appendices and briefs of the parties should be printed and the case submitted. This procedure was followed, the case being finally submitted on oral argument under date of July 17, 1963.

It is evident from the testimony taken that the parties to the controversy were given full opportunity to present their claims before the circuit judge, and the opinion rendered by Judge Coleman establishes conclusively that he gave careful consideration to all of the proofs before him. The conclusions that he reached were supported by the testimony of the witnesses. He considered the points that counsel had agreed were involved in the proceeding and concerning which testimony should be taken, and expressed clearly his finding as to each. This Court is indebted to Judge Coleman for the very careful and efficient way in which he sought to be of service in the proper disposition of the controversy. The record made in the mandamus proceeding should not be brushed aside by this Court, jurisdiction over the case terminated, and a remand made to the defendant pharmacy board for such action as it may see fit to take. Such course would leave plaintiff without a license to continue the operation of its Battle Creek store and the order of this Court under which it has been doing so would, of course, be terminated.

No question is raised as to the jurisdiction of this Court to act on the petition for a writ of mandamus.

Authority to issue such writ is expressly granted by article 7, § 4, of the present State Constitution (1908), with the incident right to hear and determine the issues involved. Plaintiff's petition for relief presented a situation to which no other proceeding available to it could with any degree of assurance prove adequate. As said by this Court in *People, ex rel. Township of LaGrange*, v. *State Treasurer*, 24 Mich 468, 477:

"It is the inadequacy, and not the mere absence, of all other legal remedies, and the danger of a failure of justice without it, that must usually determine the propriety of this writ. Where none but specific relief will do justice, specific relief should be granted if practicable. And where a right is single and specific it usually is practicable."

The language quoted was approved in *Chemical Bank & Trust Co.* v. *County of Oakland*, 264 Mich 673, 678, 679, and in *Hazel Park Racing Association, Inc.*, v. *Racing Commissioner*, 336 Mich 508, 518, and its general import has been followed in numerous prior decisions of this Court.

The adequacy of an appeal from the State board of pharmacy in a case of this nature, under the provisions of PA 1952, No 197, above cited, is open to serious question. That act defines the scope of the authority of a circuit court on appeal from a decision of an administrative agency. Such court is not given specific authority to enter the order that it may conclude the agency should have issued. Assuming that defendant board on resubmission to it of plaintiff's application for a license enters an order of denial, and the circuit judge on appeal concludes that plaintiff was under the proofs entitled to such license, a mandatory order for its issuance would clearly be beyond the jurisdiction of the circuit court. At the time of the institution of this proceeding in this Court the statute expressly provided that:

"No circuit court shall have jurisdiction to issue a writ of mandamus against any State officer." CL 1948, § 636.3 (Stat Ann § 27.2230).

Such an order would in effect be within the scope of the inhibition which was applicable to the circuit court in appellate matters as well as proceedings originating in that court. See *Mount Clemens Harness Association* v. *Racing Commissioner,* 360 Mich 467, 475, and prior decisions cited. The present judicature act is of like tenor, providing that all actions for mandamus against State officers shall be commenced in the Supreme Court. PA 1961, No 236, chap 44, § 4401 (CLS 1961, § 600.4401 [Stat Ann 1962 Rev § 27A.4401]).[8]

It should be further noted that the legislature in the enactment of PA 1952, No 197, above cited, did not undertake to make exclusive the procedure outlined for judicial review of an order of an administrative agency in a contested matter. Section 8 of the act (CLS 1956, § 24.108 [Stat Ann 1961 Rev § 3.560(21.8)]) expressly provides that:

"Nothing in this section shall be deemed to prevent resort to other means of review, redress, relief or trial *de novo,* provided by law."

The conclusion, therefore, follows that if an application for the issuance of a license, of the character here involved, results in a "contested case" within the meaning of the statute the party claiming to be aggrieved by the order entered by the agency is not limited, in any case, to the method of review specified but has an election to seek relief by any other means sanctioned by law. In the instant case the remedy by way of mandamus was clearly available. As above indicated, the authority of this Court to entertain jurisdiction on an application for such writ

---

[8] See, also, GCR 1963, 714.1.—REPORTER.

is sanctioned by the Constitution of the State and may not be limited by statute. Obviously, however, there has been no attempt by the legislature to impose any such limitation.

In its petition for writ of mandamus plaintiff alleged that defendant Moss sought to close the Battle Creek store of petitioner for the purpose of interrupting the continuous operation thereof, thus creating a bar to plaintiff's claim that it was entitled to the rights granted by the "grandfather" clause of the statute above quoted. However that may be, it is obvious that following the procedure suggested of remanding to the pharmacy board, and leaving plaintiff to a remedy other than by resort to a mandamus proceeding in this Court, might well result in such closing and thus break the continuity of operation on which plaintiff relies. Adequate protection to the petitioner here necessitates a method of procedure that will safeguard it against an invasion of any statutory rights to which it may be entitled. Under the situation presented we think that it was entitled to invoke the jurisdiction of this Court and to seek relief by way of mandamus. We may not proceed on the assumption that defendant board did not act at all in the premises. It caused inspections to be made of plaintiff's store and also of its records. Apparently it sought to gather information from various sources. Based on its activities in the matter it assumed to issue a positive and explicit order denying a license to the plaintiff and stating its reason therefor. Plaintiff properly concluded that it would be bound by said order unless it could obtain relief by appropriate court action.

Plaintiff was entitled to invoke the jurisdiction of this Court by its petition for the issuance of a writ of mandamus to the defendant board, and, in consequence, the question is now presented whether under the record before us it is entitled to the relief sought.

As before noted, Judge Coleman, hearing the proofs under the order of reference, considered in his report to this Court the questions that counsel representing the parties determined to be involved in the controversy. The reason for the denial of plaintiff's application by the order issued by defendant board on September 26, 1962, was a matter of inquiry. As before noted, said order was in writing and was in terms based on the provision of the statute authorizing the withholding of a license from an applicant on the ground that the safety of the public health would be endangered by the granting thereof, by reason of the habits or character of the applicant. Specific reference was also made to the statutory prohibition with reference to the selling of certain substances on prescription of a licensed physician, dentist, or veterinarian.

The testimony of defendant board's inspector disclosed that he found in the records of plaintiff's drug store indications that, in a very few instances, a sale had been made without there being on file a written prescription duly signed by one authorized under the statute to do so. The query is whether such incidents, limited in number as they were, may fairly be said to have endangered the public health. In this connection it is significant that the president of the State board of pharmacy testified to filling prescriptions within the scope of the statute without written authorization therefor, further stating that in his opinion the safety of the public health was not thereby endangered. Other members of defendant board gave testimony of like character. The conclusion is fully justified from the proofs that in the practice of pharmacy there has not been strict compliance by the profession generally with the claimed requirement as to the sale of certain articles on written prescription only.

With reference to the possible prejudice to the public health by the alleged improper conduct of plaintiff's employed pharmacist it should be noted that the legislature of the State by PA 1962, No 151, § 1 (CL 1948, § 338.1101, Stat Ann 1963 Cum Supp § 14.757[1]), defined the term "prescription" to mean:

"An order for drugs or devices written, signed or transmitted by word of mouth, telephone, telegraph or other means of communication by a physician, dentist or veterinarian, to be filled, compounded or dispensed, but if the order is transmitted in other than written form, it shall be recorded in writing and immediately dated by the pharmacist, and such record shall constitute the original prescription."

Said act was approved May 9, 1962. While not in effect at the time of the order of the defendant board denying plaintiff's application for a license to operate its store, it is apparent that defendants were aware of the legislative action. Defendant Moss testified that the bill was sponsored by the Michigan State Pharmaceutical Association, that it looked like a good bill, and that he did not oppose it. The president of the defendant board testified that he supported the measure.

The circuit judge, after weighing the testimony, concluded that it was common practice prior to the taking effect of the act of 1962, above cited, to fill barbiturate and amphetamine prescriptions on oral order, and that there was no evidence that plaintiff had ever filled unauthorized prescriptions. Under the record before us the conclusion cannot be avoided that the reason given by the defendant board for denying a license to the plaintiff for the operation of its Battle Creek drug store was not well-founded. It is significant in this respect that the board's inspector, after his examinations of the store and its

records, gave it a 90% rating, somewhat higher than the average.

It has been stipulated by counsel that plaintiff corporation conducted a drug store in the city of Battle Creek from January 1, 1927, to January 1, 1958, and during said period did not cease at any time to be actively engaged in the practice of pharmacy. It further appears that it was issued a license for the carrying on of said operation for each year to and including June 30, 1962. On behalf of defendants, however, the claim has been advanced that it was not so engaged during the period from August 30, 1958, to November 24th thereafter. It appears that during said period the store was being remodeled and that it was deemed impracticable to keep it open for the conduct of business during the desired operation. It appears, however, that the president of the corporation was in and out of the store checking and storing stock, and generally supervising the work of remodeling for which expenditures of between $10,000 and $12,000 were made. The public was informed that the store was closed because of the remodeling operation and that refills could be had at another store. Business calls were received during the remodeling period and the prescription files were transferred to another pharmacy so that plaintiff's customers could be served. From time to time announcements were made to the public with reference to the reopening of the store. Supplies and new stock were ordered, and preparations made for the resumption of active operations. It is apparent from the proofs that there was no intention on the part of the plaintiff of abandoning the operation of the drug store which was reopened on November 24, 1958, such reopening being somewhat delayed because of failure in the delivery of fixtures as ordered. The circuit judge concluded, and we think correctly so, that there was no cessation of the

business of the drug store during the period in question, and that defendants' claim to the effect that the remodeling operation had resulted in a loss of the rights claimed by plaintiff under the so-called "grandfather" clause of the statute was not well-founded. Obviously the denial of the license was not based on any such finding. As before pointed out, the duty rested on defendant board to disclose the reason for taking the action indicated by its order of September 26, 1962, and, in fact, it did state such reason.

It appears from the stipulation of facts entered into by counsel for the parties that under date of May 25, 1962, the stock of the Owl Drug Company was acquired by The Kroger Company. PA 1927, No 359, the first section of which act is above quoted, in terms forbids ownership of a drug store, pharmacy, or apothecary shop by a partnership or corporation unless at least 25% of all stock is owned by registered pharmacists. However, such inhibition was declared not applicable to any corporation which at the time of the passage of the act owned and conducted a drug store, pharmacy, or apothecary shop, within the State, and continued in such operation. The question has been raised as to the constitutionality of said act, it being assailed primarily on the ground that it bears no relation to the public health, welfare, or safety. It is suggested that the ownership of 25% of the stock of a corporation does not carry with it the right to dictate the business policies thereof, to elect its officials, or otherwise control its procedures. In *Louis K. Liggett Co.* v. *Baldridge,* 278 US 105 (49 S Ct 57, 73 L ed 204), a statute of the State of Pennsylvania requiring that all stock of a corporation conducting a pharmacy or drug store should be owned by registered pharmacists was declared unconstitutional, the court pointing out that the ownership of the stock

does not involve the compounding of drugs and prescriptions sold and furnished to the public. That function is the responsibility of a registered pharmacist. It is of interest to note that in the case at bar defendant Moss testified to ownership of a 1/3 interest in a drug store in Washtenaw county, but that he took no active part in its management. A minority stockholder in a corporation might conceivably take a like view of his obligations.

However, it does not appear that the constitutionality of the act of 1927 is before us at this time. If it is in fact unconstitutional, then plaintiff is entitled to a license to operate its drug store. On the other hand, if valid, then the proofs establish that plaintiff is entitled to the rights granted under the so-called "grandfather" clause. Regardless of possible practical implications, the ownership of the stock in plaintiff corporation is not, from a legal standpoint, involved in this case.

The factual findings as presented to this Court by the circuit judge are fully sustained by the record. The reason given by defendant board for denying the requested license to plaintiff to the effect that the public health would thereby be endangered is without reasonable basis. The proofs relating to the issues involved in the case have sufficient weight to require the granting of the relief sought. The writ will accordingly issue directing the defendant board to grant a proper license for the operation of the plaintiff's Battle Creek pharmacy and drug store. No costs are allowed.

DETHMERS and KELLY, JJ., concurred with CARR, C. J.

SOURIS, J. (*dissenting*). I share Mr. Justice BLACK's abhorrence of executive or legislative interference with duties exclusively the obligation of the

judicial department and his conclusion that the activities of the governor and the Democratic party chairman in matters directly related to this pending case give our divided decision the *appearance* that our members have bowed to partisan influences. However, I do not believe we further the cause of judicial independence by pronouncing premature denunciatory judgment against such activities and their authors based solely upon newspaper accounts and absent any effort on our part independently to determine the actual facts involved. Of primary concern to me are the circumstances by which the judicial report we ordered Judge Coleman to make for submission to this Court was disclosed to the governor before the Justices had been advised even of its existence. I suggest, respectfully, that our first order of business after release of these opinions should be determination of such circumstances pursuant to the procedures specified in GCR 1963, 930.

Subject to the foregoing, I concur in Justice BLACK's opinion.

KAVANAGH, J., concurred with SOURIS, J.

SMITH, J. (*concurring in the writ*). Having accepted and maintained jurisdiction in this case, we think we are now duty-bound to decide. At this Court's direction, a full judicial hearing has been accorded the parties. A large and comprehensive record, made upon our specific order, is before us. From that record, we cannot avoid the conclusion that the relief sought should be granted. We concur, therefore, in the result reached by Chief Justice CARR in his opinion.

O'HARA, J., concurred with SMITH, J.