SUPERX DRUGS CORPORATION, a
Michigan corporation, Plaintiff,

v.

The MICHIGAN BOARD OF PHARMA-
CY and Paul C. Coussen, Francis G.
Putvin, Frank E. Reilly, Bert C. Bren-
nan and Richard J. Wilson, Members of
the Michigan Board of Pharmacy, De-
fendants.

Civ. A. No. 4712.

United States District Court
W. D. Michigan, S. D.

Sept. 22, 1964.

McGraw, Allen, Haass & Selander,
Detroit, Mich., James C. Allen, Detroit,
Mich., of counsel, Arnold, Fortas &
Porter, Washington, D. C., for plaintiff.

Frank J. Kelley, Atty. Gen., by Joseph B. Bilitzke, Asst. Atty. Gen., Lansing, Mich., for defendants.

FOX, District Judge.

The facts of this case and the course which it has followed through the various legal channels of this State present a confused state of affairs, and one with potential consequences of lasting importance.

The following is not a complete statement of the facts, but it is adequate to set the stage for an interim determination of the motions presently before this Court.

In mid-1962, the Kroger Company, a multi-state chain grocery store operation, purchased the Owl Drug Company, a Battle Creek pharmacy, and under that name applied to the defendant Board of Pharmacy for a renewal of its license. In September 1962, the name of the company was changed to Superx Drugs Corporation. Since October 16, 1962, it has been operating by leave of a restraining order of the Michigan Supreme Court prohibiting interference with its operation pending the outcome of this case.

Michigan Statutes Annotated, § 14.-771, Comp.Laws 1948, § 338.481 [1] provides that no partnership or corporation shall own a drug store in which less than 25% of all stock is held by registered pharmacists. There is an exception in favor of drug stores owned by corporations at the time of the enactment of this statute. Plaintiff rests its position on this existing corporate ownership, the so-called "grandfather clause."

Presuming the grant of a renewal license in Battle Creek, plaintiff established three other stores at separate sites in the State of Michigan, and presuming further, planned to seek licenses for these pharmacies on the strength of its Battle Creek license.

From the facts of this case and the nature of plaintiff's operations, it is not improbable that this Battle Creek license would serve as the foundation for a pattern of chain drug stores in Kroger's grocery stores throughout the State of Michigan.

At the hearing held on September 26, 1962, by the Board of Pharmacy, the request for a license was denied. Because the hearing was held before some nine hundred pharmacists presumably

---

1. "Every pharmacy, drug store or apothecary shop shall be owned by a registered pharmacist and no partnership or corporation shall own a drug store, pharmacy or apothecary shop unless at least 25 per cent of all stock is held by registered pharmacists, except that any corporation, organized and existing under the laws of the state of Michigan, or any other state of the United States, authorized to do business in the state of Michigan and empowered by its charter to own and conduct pharmacies, drug stores or apothecary shops and which, at the time of the passage of this act, owns and conducts a drug store or stores, pharmacy or pharmacies, apothecary shop or shops in the state of Michigan may continue to own and conduct the same and may establish and own additional pharmacies, drug stores or apothecary shops in accordance with the provisions of this article: Provided, That any such corporation which shall not continue to own at least 1 of the pharmacies, drug stores or apothecary shops theretofore owned by it, or ceases to be actively engaged in the practice of pharmacy in the state of Michigan, shall not be permitted thereafter to own a drug store, pharmacy or apothecary shop: And provided further, That any person not a registered pharmacist who at the time of the passage of this act owns a pharmacy, drug store or apothecary shop in the state of Michigan, may continue to own and conduct the same in accordance with existing laws and regulations: And provided further, That the administrator, executor or trustee of the estate of any deceased owner of a pharmacy, drug store or apothecary shop, or the widow, heirs or next of kin of such deceased owner, may continue to own and conduct such pharmacy, drug store or apothecary shop in accordance with existing laws and regulations: Provided further, That this act shall not apply to stores or shops in which patent or proprietary medicines and ordinary domestic or household remedies, such as the sale of is provided for in section 18 of Act No. 134, Public Acts of 1885, are the only drugs and medicines sold at retail."

adversely disposed to plaintiff's application, and because of the manner in which the proceedings were conducted, plaintiff on the very next day, September 27, petitioned the Michigan Supreme Court for a writ of mandamus to compel issuance of the license.

In applying to the original jurisdiction of that court, plaintiff, with full knowledge of the eight-man composition of the Michigan Supreme Court, and the possibility that it might divide equally over a proposition, chose to neglect the customary procedures for appealing the decision of an administrative board. However, the Supreme Court accepted the case, and in a 5–3 decision entered on December 5, 1963, ordered that the writ be granted and that the license be issued.

The most cursory glance at that decision reveals the profound division of opinion surrounding the case. The three dissenting Justices emphasized the opinion that the Court should not have accepted the case, but should have sent it back to be decided by "orderly due process of administrative law." 372 Mich. 22, 125 N.W.2d 13, at 23. Two of the concurring Justices joined only in the result, expressing misgivings over the procedural way in which the case was handled. 372 Mich. 22, 125 N.W.2d at 23, 32.

Defendants filed a timely motion for rehearing, and on February 3, 1964, the motion for rehearing was denied as a result of a 4–4 vote of the eight Justices of the Michigan Supreme Court.

This did not mark the end of the matter, however, for the Clerk of the Supreme Court subsequently received written messages from both divisions of the Court on the effect of that vote.

One stated that the result was that the writ of mandamus should not issue as a consequence of the 4–4 deadlock, the other directing that the writ should issue. The official entry shows merely that the motion for rehearing was denied.

In any event, no formal writ has ever issued, and plaintiff is now before this Court with the claim that the 5–3 decision of December 1963 is res judicata,

and because of defendant Board's continued refusal to issue the license, plaintiff is being denied its constitutional guarantees of equal protection of the laws and due process.

Plaintiff now seeks a preliminary injunction and summary judgment from this Court, while defendants move to dismiss.

The beacon to which the court is drawn by this vortex of uncertainty is the 4–4 tie on the motion for rehearing and the effect which this has on the 5–3 decision granting the writ in December of 1963.

While it is true that under General Court Rules of 1963 (M.S.A. § 714.5) a writ of mandamus is contained in the order of judgment, a timely motion for rehearing was filed, which stayed the operation of the writ. The hearing on that motion resulted in a 4–4 vote and the consequences of that vote are unsettled.

M.S.A. § 27A.230, Pub.Acts 1961, No. 236 provides that when the Justices of the Supreme Court are equally divided on the ultimate decision of any case properly before the Court on review, the judgment of the court below shall be affirmed. The principle underlying this statute is that in such cases the tie-breaking vote is that of the trial judge in the court below.

The question, therefore, is whether or not an equally divided Supreme Court affirms its own judgment, rendered in an exercise of its original jurisdiction, when there is no Circuit Judge to break the tie.

In the hiatus between the December decision and the February vote, the Chief Justice of the Michigan Supreme Court was replaced by a new Justice, a new Chief Justice was designated, and a new State Constitution came into effect which altered the language of the old Constitution designating individual writs to language which provided simply for "perogative and remedial writs." Mich.Const. of 1963, Art. VI, Sec. 4.

That the face of the Court changed visibly is evidenced by the fact of the 4–4 vote on the motion for rehearing.

While it was technically a vote on a motion for rehearing, the facts show that the Michigan Supreme Court in effect changed its vote, for a rehearing or denial of it depends upon the existence of facts or law sufficient to support the original judgment.

Under these circumstances, four Justices of the Supreme Court indicated that the original judgment should not stand, four held that it did. From an examination of the record, therefore, it is apparent that at least four Justices of the Michigan Supreme Court are convinced that the first decision is not res judicata.

In this unique situation, can it be definitely said that the December 1963 decision is res judicata? If so, plaintiff argues, its constitutional basis for a summary judgment in this suit stands. But if it is not res judicata, there is no foundation for plaintiff's argument, and it is reasonably possible that this Court will have to hear the case de novo to determine whether equal protection of the law has been denied either by the action of the Board or the Supreme Court.

■■  Under these circumstances, it is prudential jurisprudence to have the Supreme Court of the forum state clarify the relevant issues. When a Federal District Court is presented with a claimed breach of a constitutionally protected right, which may spring from the action or inaction of a State Supreme Court in a given case, it is sound jurisprudence for the Federal Court to forebear so as to give the highest Court of the forum state a reasonable opportunity to write the law of the State which is to be applicable if controlling on the issue before the Federal Court.

At this point I wish to remark that the case of Lewis v. City of Grand Rapids, et al., 222 F.Supp. 349, cited extensively in plaintiff's brief, contains many important factual distinctions.

A final point which further highlights the uncertainty of this case for this Court is an apparent conflict between the Michigan General Court Rules and the decision of December 1963.

While their scope has not been expanded, the perogative writs have been absorbed into the new order of superintending control, which permits a broader exercise of powers. Preliminary Committee Comment to Extraordinary Writs Rules, M.S.A., General Court Rules, P. 267.

The scope of this power is demonstrated by the following quote from the Committee Comment to Rule 711.1, General Court Rules:

"The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. Moreover, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted. This power is not limited by forms of procedure or by the writ used for its exercise. Furthermore it is directed primarily to inferior tribunals, and its relation to litigants is only incidental."

Furthermore, the New Hampshire Supreme Court, acting under language empowering a writ of superintending control over "courts of inferior jurisdiction," exercised the power over a board which was exercising judicial power. Dinsmore v. Manchester, 76 N.H. 187, 81 A. 533. A fortiori, therefore, it would seem that the writ involved here, under the more comprehensive language of the Michigan Court Rules is actually that of superintending control.

Webster's Third International Dictionary defines a tribunal as:

"The seat of a judge or one acting as a judge: the bench on which a

judge and his associates sit for administering justice: * * * a court or forum of justice: a person or body of persons having authority to hear and decide disputes so as to bind the disputants * * *: something that decides or judges: something that determines or directs a judgment or course of action * *."

The 1963 Constitution, which was effective as of January 1, 1964, has a new provision, Article VI, Section 28, which states:

"Administrative action, review, Sec. 28. All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. Findings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law."

The State Administrative Code adopted by the legislature as Public Act No. 197 of 1952, M.S.A. 3.560(21.1), Comp. Laws 1948, § 24.101, in Section 1(1) defines "agency":

" 'Agency' means any state board, commission, department, bureau or officer, authorized by law to make rules or to adjudicate contested cases, except the workmen's compensation commission, the employment security commission, the department of revenue, the public service commission and those in the legislative and judicial branches."

Section 1(2) defines "rule."

Section 1(3) defines a "contested case" as being a "proceeding before an agency in which the legal rights, duties or privileges of a specific party or specific parties are required by law or constitutional right to be determined after an opportunity for an agency hearing."

It is conceivable that the Michigan Supreme Court had all this in mind when it adopted General Court Rule 711.

Thus, we see Rule 711.1 calls for the writ of superintending control to be used in exercising power over *inferior tribunals*. It appears that the writ of December 1963 should have been one of superintending control, and not of mandamus, in view of the fact that mandamus when directed to an inferior tribunal or officer thereof, is *superseded by the order of superintending control*. General Court Rule 711.3. It appears reasonably certain that the Michigan Supreme Court would have the authority to exercise superintending control over an agency when its action may involve questions of Fourteenth Amendment constitutionally protected rights of due process, confrontation of witnesses, hearings, and equal protection of the law.

This conclusion is further enforced by Michigan Court Rule 714.1, which appears to call for use of the writ of mandamus against state officers. State officers in the context of Rule 714.1 must be distinguished from those who constitute inferior courts or tribunals— agency tribunals acting in a judicial or quasi-judicial capacity.

In view of this dichotomy drawn between the objects of the writs of mandamus and superintending control, the two appear to be mutually exclusive when considered in light of this distinction between state officers and "tribunals."

The proviso that the writ shall be contained in the judgment, in the form of an order, and a separate writ need not be issued or served, is found only in Rule 714, Section 5.

From any standpoint, this is a highly unusual case, and were a one-man Federal Court to render a decision in such a case,

involving, as it apparently does, the nascent writ of superintending control, it could conceivably have a heavy bearing on future interpretations of that writ, and thus in some measure determine the course of future state law. The undesirability of this result is too obvious for further comment, and provides an added reason for deferring, for the time being, to the Michigan Supreme Court.

In Harrison v. N.A.A.C.P., 360 U.S. 167, at page 176, 79 S.Ct. 1025, at page 1030, 3 L.Ed.2d 1152, Mr. Justice Harlan, speaking for the Court, said:

"[Abstention] is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize the possibility of such interference a 'scrupulous regard for the rightful independence of state governments * * * should at all times actuate the federal courts,' Matthews v. Rodgers, 284 U.S. 521, 525, [52 S.Ct. 217, 219, 76 L.Ed. 447, 452] as their 'contribution * * * in furthering the harmonious relation between state and federal authority * * *.' Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 501 [61 S.Ct. 643, 645, 85 L.Ed. 971]. In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. See, e. g., Railroad Commission of Texas v. Pullman Co., supra; City of Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, [62 S.Ct. 986, 86 L.Ed. 1355]; Spector Motor Service Inc. v. McLaughlin, 323 U.S. 101 [65 S.Ct. 152, 89 L.Ed. 101]; American Federation of Labor v. Watson, 327 U.S. 582, [66 S.Ct. 761, 90 L.Ed. 873];

Shipman v. DuPre, 339 U.S. 321, [70 S.Ct. 640, 94 L.Ed. 877]; Albertson v. Millard, 345 U.S. 242 [73 S.Ct. 600, 97 L.Ed. 983]; Government & Civic Employees Organizing Committee, C.I.O. v. Windsor, 353 U.S. 364, [77 S.Ct. 838, 1 L.Ed.2d 894]. *This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication.* See City of Chicago v. Fieldcrest Dairies, Inc., supra, 316 U.S. at pages 172–173 [62 S.Ct. at page 988]. (Emphasis supplied.)

The latest pronouncement of the Supreme Court on the doctrine of abstention is contained in the opinion of Mr. Justice Brennan, speaking for the Court in England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440:

"There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims. Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific heads of jurisdiction upon the federal courts, and with the principle that 'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction * * *. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.' Willcox v. Consolidated Gas Co., 212 U.S. 19, 40 [29 S.Ct. 192, 53 L.Ed.2d 382]. Nor does anything in the abstention doctrine require or support such a result. Abstention is a judge-

fashioned vehicle for according appropriate deference to the 'respective competence of the state and federal court systems.' Louisiana P. & L. Co. v. Thibodaux, 360 U.S. 25, 29 [79 S.Ct. 1070, 3 L.Ed.2d 1058]. *Its recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law. Accordingly, we have on several occasions explicitly recognized that abstention 'does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise.'* Harrison v. NAACP, 360 U.S. 167, 177 [79 S.Ct. 1025, 3 L.Ed.2d 1152]; accord, Louisiana P. & L. Co. v. Thibodaux, supra, 360 U.S., at 29 [79 S.Ct. at 1073, 3 L.Ed. 2d 1058]." (Emphasis supplied.)

The law is well established that under Rule 56 of the Federal Rules of Civil Procedure a summary judgment should not be entered unless it clearly and conclusively appears that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. In the case of Knapp v. Kinsey, (CCA 6) 249 F.2d 797, in considering a motion for summary judgment under Rule 56, the court of appeals for this judicial circuit said at Pages 801 and 802 as follows:

"The construction and applicability of the summary judgment rule has been before us on several previous occasions. In Begnaud v. White, 6 Cir., 170 F.2d 323, 327, we said, 'The authorities indicate that the trial judge should be slow in passing upon a motion for summary judgment which would deprive a party of his right to a trial by jury where there is a reasonable indication that a material fact is in dispute,' citing Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. In Lloyd v. United Liquors Corp., 6 Cir., 203 F.2d 789, 793, we quoted with approval from the opinion in Doehler

Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135, as follows, 'We take this occasion to suggest that trial judges should exercise great care in granting motions for summary judgment. * * Denial of a trial on disputed facts is worse than the delay.' "

In the case of Yonkers Contracting Co. v. Maine Turnpike Authority, D.C., 24 F.R.D. 205, in discussing a motion for summary judgment under Rule 56, the court said in part at Page 226:

"It is settled that a summary judgment in an action may be entered if, but only if, the pleadings, depositions, and admissions on file, show that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment he seeks as a matter of law. Such a judgment should never be entered for a defendant on his motion, unless he be entitled to it beyond all doubt. To warrant its entry, the facts alleged or admitted by the plaintiff, or *demonstrated beyond reasonable question to exist, should disclose defendant's right to a judgment with such clarity as to leave no room for controversy, and they should affirmatively show that plaintiff would not be entitled to recover under any discernible circumstances. Being an extreme remedy, a summary judgment should be awarded only if and when the truth is quite clear. And all reasonable doubt touching the existence of a genuine issue as to a material fact must be resolved against a party who has moved for summary judgment.*" (Emphasis supplied.)

In Shafer v. Reo Motors, Inc., (CCA 3) 205 F.2d 685, the court said at Page 688:

" '*A litigant has a right to a trial where there is the slightest doubt as to the facts * * *.*' Doehler Metal Furniture Co., Inc., v. United States, 2 Cir., 149 F.2d 130, 135; Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 627, 64 S.Ct. 724, 88

L.Ed. 967; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 1951, 189 F.2d 213, 216." (Emphasis supplied.)

In Whitaker v. Graves, D.C., 18 F.R.D. 246, in considering a motion for summary judgment, the court said at Page 248:

"In ruling on a motion for summary judgment, the Court's function is not to resolve existing factual disputes but to determine whether there are genuine issues as to any material fact. * * * 'We take this occasion to suggest that trial judges should exercise great care in granting motions for summary judgment. A litigant has a right to a trial where there is the slightest doubt as to the facts * * *.'"

See also the many authorities bearing upon the question of a motion for summary judgment cited in the Knapp v. Kinsey and Yonkers Contracting Company cases from which I quoted.

Thus, if as a matter of law the facts are not resolved by Superx v. Pharmacy Board, supra, then summary judgment, as urged by plaintiff, cannot be granted by this Court. There is substantial question and doubt on the present record.

The decision on the motion for summary judgment will be held in abeyance until some final or further disposition by the Michigan Supreme Court.

Plaintiff raises two objections to this course of action: first, that it is fraught with the possibility of a proliferation of litigation; and, secondly, that the position of the Michigan Court is clear and the law does not require plaintiff to do a useless thing—seek a remedy where patently none will be given.

Answering these in reverse order, let it be said that this Court does not view such conduct a "useless thing" and will not exercise its discretion in plaintiff's favor on the strength of its mere assertion that further state proceedings are useless.

As to the claim of excessive litigation, plaintiff has contributed to this situation by its own action. It first chose to bypass the customary avenues of appeal from a Board of Pharmacy decision and went straight to the Supreme Court with a request for exercise of its original jurisdiction. It now seeks to slip away from a complete disposition in that Court by recourse to this Court. These practices were perfectly proper, but merely because matters have not proceeded as quickly or as favorably as plaintiff had anticipated, it will not now be heard to object to the course here outlined.

Furthermore, if plaintiff's contention is correct, there is no possibility of drawn-out litigation. If the December 1963 decision is res judicata, as plaintiff insistently contends, the state proceedings will be summary. If the Supreme Court unaccountably refuses to enforce its writ, plaintiff will then have a clear and uncomplicated claim to relief.

It is unfortunate and perhaps somewhat wasteful of court time to require this additional action, but there has been no monopoly of virtue on either side of this case, and the long-standing history of good relations between the state and federal judiciary in this state compels me to allow my brethren opportunity to enter their opinions in this matter.

It is to be noted that plaintiff's presumptive action in establishing these places of business before the issuance of a license has substantially contributed to the situation in which it finds itself. While this is a lamentable situation, the potential impact of this decision on the practice of pharmacy in this state, with its possible concomitant side effects on the hundreds of pharmacists now depending on such practice for their livelihoods, urges the widest possible consideration of all aspects of this case.

Accordingly, this Court will retain jurisdiction of this case while awaiting a further or final determination in the state tribunal.

Therefore, the plaintiff may act on its claimed writ by asking the Michigan Supreme Court to enforce it. This will clearly draw the issue and allow that

Court to enter its opinion, if it feels compelled to do so.

Alternatively, as this Court reads the Court Rules, there does not seem to be any reason why the Board itself, if confused by the conflicting state of affairs, could not petition the same Court for a writ of superintending control, seeking an order as to its duties.

Jurisdiction of this case is retained pending action by either of the parties in accordance with this opinion.